# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LENA SMITH O/B/O** | ) | |
| **JAMES B. SMITH**,[1] | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00038 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Lena Smith, filed this action on behalf of her deceased husband, James B. Smith, ("Smith"), challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that Smith was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings

---

[1]James B. Smith died on June 27, 2009, two days before the filing of the Complaint in this case. Although the Complaint was originally brought in Smith's name, his wife was later substituted as the plaintiff in this case. (Docket Item No. 5).

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Smith protectively filed his applications for DIB and SSI on June 6, 2006, alleging disability as of July 1, 2000, due to back impairments, diabetes, neuropathy, toe ulcers, hypertension, a heart murmur, obesity, high cholesterol, bipolar disorder and depression. (Record, ("R."), at 71-74, 83, 101.) The claims were denied initially and on reconsideration. (R. at 47-49, 50-52, 53-55.) Smith then requested a hearing before an administrative law judge, ("ALJ"), (R. at 46), which was held on November 14, 2007, and at which he was represented by counsel. (R. at 716-43.)

By decision dated December 13, 2007, the ALJ denied Smith's claims. (R. at 17-30.) The ALJ found that Smith met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2005. (R. at 19.) The ALJ also found that Smith had not engaged in substantial gainful activity since July 1, 2000, the alleged onset date. (R. at 19.) The ALJ determined that the medical evidence established that Smith suffered from severe impairments, namely degenerative disc disease of the thoracic and lumbar spine status post lumbar laminectomy, diabetes

mellitus, polyneuropathy, hypertension, obesity and an affective disorder, but he found that Smith did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ found that Smith had the residual functional capacity to perform less than the full range of light work.[2] (R. at 26.) Specifically, the ALJ found that Smith could lift items weighing up to 40 pounds occasionally and up to 20 pounds frequently, stand and sit for four hours in an eight-hour workday with positional changes every 30 minutes, climb four flights of stairs while carrying a load without resting, bend and stoop for up to two-thirds of the day and squat, kneel and crawl for less than one-third of the day. (R. at 26.) The ALJ also found that Smith could not climb ladders, ropes or scaffolds or work around hazardous machinery and that his depressed mood, anxiety, drowsiness from medication and pain further limited him to simple, routine tasks. (R. at 26-27.) Thus, the ALJ found that Smith could not perform any of his past relevant work. (R. at 28.) Based on Smith's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Smith could perform, including jobs as an interviewer, a document preparer and a surveillance system monitor, all at the sedentary level of exertion.[3] (R. at 29.) Thus, the ALJ found that Smith was not under a disability as defined under the Act and was

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2010).

[3]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2010).

not eligible for benefits. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2010).

After the ALJ issued his decision, Smith pursued his administrative appeals, (R. at 13), but the Appeals Council denied his request for review. (R. at 7-10.) Lena Smith, on her husband's behalf, then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2010). The case is before this court on Lena Smith's motion for summary judgment filed February 22, 2010, and the Commissioner's motion for summary judgment filed April 23, 2010.

## II. Facts & Analysis[4]

Smith was born in 1964, (R. at 721), which, at the time of his death, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He had a college education and some training in the teaching field. (R. at 722.) Smith had past relevant work experience as a sales associate at Walmart and Lowe's and as a manager of the toy department at Walmart. (R. at 727-28.) He testified that he experienced constant, chronic lower back pain, which activity worsened, but which was made tolerable by pain medication. (R. at 729-31.) He stated that his legs were "pretty much dead below the knee," referring to "[m]ajor, severe neuropathy." (R. at 729, 731-32.) Smith stated that he suffered from skin ulcers on his feet and that he had moderate to severe neuropathy of the hands, which was helped by medication. (R. at 732.)

---

[4]The relevant time period for determining disability for SSI purposes in this case is from July 1, 2000, the alleged onset date, through November 14, 2007, the date of the ALJ's hearing. The relevant time period for determining disability for DIB purposes is from July 1, 2000, through September 30, 2005, the date last insured.

Smith testified that he had experienced suicidal thoughts in the past, had attempted suicide in 2003 and continued to have "[s]emi-serious" suicidal thoughts. (R. at 733.) He testified that he had crying spells almost every day, lasting from 30 minutes to an hour. (R. at 733.) Smith testified that his problems worsened until he became unable to work in 2001. (R. at 734.) He stated that his wife had to help him with personal care since 2004. (R. at 734.) Smith stated that he spent about 12 hours straight daily in front of the computer, but that he could not concentrate for more than 10 minutes at a time. (R. at 734-35.) He stated that he did not do a lot of typing and that his fine motor skills were "pretty much gone." (R. at 735.) Smith testified that he used to be able to write poetry and academic papers, but could no longer do so. (R. at 735-36.)

Bonnie Martindale, a vocational expert, also was present and testified at Smith's hearing. (R. at 736-43.) Martindale classified Smith's past work as a retail sales clerk in electronics as light and semiskilled, but, as performed, heavy[5] at times. (R. at 737.) She classified Smith's past work as a toy department manager as medium[6] and skilled, as a retail sales clerk in appliances, as performed, as heavy and as a retail sales clerk in a paint department as light and semiskilled. (R. at 737.) Martindale was asked to consider a hypothetical individual of the same age, education and work history as Smith with the physical abilities and limitations as set forth in Dr. Blackwell's

[5]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2010).

[6]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2010).

assessment, who also suffered from some depression, fatigue and mild pain in the back and legs. (R. at 738.) Martindale testified that such an individual could not perform any of Smith's past relevant work, but could perform jobs existing in significant numbers in the national economy, including those of an interviewer, a document preparer and a surveillance monitor, all at the sedentary level of exertion. (R. at 738-40.) Martindale was asked to consider the same hypothetical individual, but who had a moderate reduction in concentration. (R. at 741.) She testified that such an individual could perform the same jobs. (R. at 741.) When asked to consider the same hypothetical individual, but who had a severe reduction in concentration, Martindale testified that such an individual could perform no jobs. (R. at 741-42.) Likewise, when asked to consider a hypothetical individual who, due to pain, medication, fatigue and inability to sleep, would have to rest three to four hours a day, she testified that such an individual could perform no work. (R. at 742.) She also testified that an individual who would miss one day of work per week could not perform any work. (R. at 742-43.)

In rendering his decision, the ALJ reviewed records from Dr. Elizabeth Cooperstein, M.D.; Dr. Douglas A. Wright, M.D., a neurologist; Wellmont Holston Valley Hospital; Dr. Gregory Corradino, M.D., a neurosurgeon; Frontier Health; Wellmont Lonesome Pine Hospital; Southeastern Retina Associates; Wellmont Home Care; Dr. Lance Dozier, M.D.; Dr. Lisa A. McKinney, D.O.; Hugh Tenison, Ph.D., a state agency psychologist; Dr. Kevin Blackwell, D.O.; Dr. Frank M. Johnson, M.D., a state agency physician; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Gary T. Bennett, Ph.D., a licensed clinical psychologist; and Indian Path Medical Center. Smith's counsel submitted additional evidence from St. Mary's Family Center

to the Appeals Council.[7]

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and (5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2010).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2010); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

---

[7]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 7-10), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.967(d), if he sufficiently explains his rationale and if the record supports his findings.

Lena Smith argues that the ALJ erred in his physical and mental residual functional capacity findings. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-11.) She also argues that the ALJ erred by failing to find that Smith's impairment(s) met or equaled the medical listing for diabetes mellitus related disorders, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08(A). (Plaintiff's Brief at 11-14.) Lena Smith next argues that the ALJ erred

by failing to find that Smith's impairments met or equaled the medical listing for depressive disorders, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04. (Plaintiff's Brief at 14-16.) Lastly, she argues that the ALJ erred by failing to give appropriate consideration to Smith's obesity and its effects on his ability to perform routine movements and necessary physical activity within the work environment. (Plaintiff's Brief at 16-17.)

I find it unnecessary at this time to address Lena Smith's arguments relating to Smith's physical impairments and resulting physical residual functional capacity, as I find that the ALJ erred by relying on Smith's noncompliance with prescribed medical treatment as a basis for finding him not eligible for benefits without following the procedure set forth in Social Security Ruling 82-59, as adopted by this court in *Nunley v. Barnhart*, 296 F. Supp. 2d 702 (W.D. Va. 2003). Although Dr. Elizabeth Cooperstein, M.D., Smith's treating physician, attempted to treat his diabetes, it was largely uncontrolled due to his serious noncompliance with treatment recommendations and with his refusal to seek diabetic teaching. There is no question that the evidence contained in the record on appeal documents such serious noncompliance by Smith. For instance, in January 2001, Dr. Cooperstein diagnosed diabetes under poor control, slightly increased blood pressure, gastroesophageal reflux disease, ("GERD"), stable, and hypercholesterolemia, which she suspected was related to diabetes. (R. at 182.) However, Smith declined diabetic teaching. (R. at 182.) On May 2, 2001, Dr. Cooperstein increased Smith's dosage of Glucophage, noting that his diabetes needed to be under better control. (R. at 178.) Smith again declined diabetic teaching, and Dr. Cooperstein referred him to an endocrinologist. (R. at 175, 178.) On August 20, 2001, Smith's blood pressure was well-controlled. (R. at 174.) On June 3, 2002, Smith's diabetes remained very poorly controlled, and Dr.

Cooperstein noted medical noncompliance.  (R. at 168.)  On February 26, 2003, Smith's blood sugar levels were not managed, and he had not recently followed with the endocrinologist as recommended.  (R. at 166.)  Dr. Cooperstein diagnosed a history of medical noncompliance, among other things.  (R. at 166.)  She reported that she would attempt to manage Smith's severe diabetes since he could not keep appointments with specialists.  (R. at 166.)  On June 25, 2003, Smith reported taking his medications as advised and agreed to follow-up with endocrinology in July.  (R. at 161.)  Physical examination showed a shallow excoriated ulcer on the left shoulder. (R. at 161.)  On November 5, 2003, Dr. Cooperstein stated as follows: "As usual, [Smith] has not been compliant with his specialty follow-up or his medical regimen." (R. at 160.)  His primary complaint was poor sleep, and he admitted not checking his blood sugar levels.  (R. at 160.)  Two large areas of callous with dark centers were noted, one on each foot, and he was referred to podiatry.  (R. at 160.)

On May 3, 2004, Dr. Cooperstein noted that Smith was recently treated for cellulitis of the right calf, with residual cystic structure.  (R. at 159.)  He was not checking his blood sugar levels, and he had plans to have a foot ulcer evaluated.  (R. at 159.)  Smith's blood pressure was 150/86, and a hard callous on the left great toe with an ulcerated center and a cystic lesion on the right calf were noted.  (R. at 159.) Dr. Cooperstein again diagnosed noncompliance. (R. at 159.) She recommended surgery to evaluate the residual cyst, advised Smith to continue his medications and to follow-up regarding diabetic feet. (R. at 159.)  She also discussed the risks of Smith's noncompliance.  (R. at 159.)  There is no evidence in the record showing that Smith ever underwent any surgery to evaluate this cyst. On September 21, 2004, Smith again admitted to not checking his blood sugar levels. (R. at 158.) Dr. Cooperstein noted a history of "serious noncompliance."  (R. at 158.) On November

15, 2004, Smith reported reopening a wound on the right great toe, for which Dr. Cooperstein advised him to return to the wound care center. (R. at 153.) He was not checking his blood sugar levels. (R. at 153.) On January 26, 2005, Smith stated that he was checking his blood sugar levels, noting that they averaged in the 400s in the mornings. (R. at 152.) His blood pressure was 150/90. (R. at 152.) Dr. Cooperstein diagnosed diabetes mellitus with end organ damage, hyperlipidemia, hypertension and renal insufficiency, and she increased his dosage of Humulin. (R. at 152.) A renal ultrasound on April 26, 2005, was normal. (R. at 262.) On May 6, 2005, Smith reported trying to be more aggressive controlling his blood sugar levels, reporting average readings in the mid-100s, occasionally "spik[ing] up" when he did "something he [knew] he shouldn't." (R. at 150.) He complained of numbness and burning in the feet and recent worsening of the right diabetic foot ulcer. (R. at 150.) His blood pressure was 150/90. (R. at 150.) Dr. Cooperstein diagnosed diabetes mellitus with diabetic feet and neuropathy, hypertension and hyperlipidemia, among other things. (R. at 150.) Smith requested a neurology consult regarding his neuropathy. (R. at 150.)

The record shows that Smith also was noncompliant with repeated recommendations to undergo nuclear stress testing. On August 16, 2002, Smith first complained of occasional chest pain, and Dr. Cooperstein ordered a nuclear stress test. (R. at 167.) However, on February 26, 2003, Smith had not undergone this testing, which Dr. Cooperstein rescheduled. (R. at 166.) On June 25, 2003, Smith still had not undergone the stress test, and he denied chest pains at that time. (R. at 161.) Again in November 2003, September 2004 and November 2004, Smith reported not having undergone this recommended testing. (R. at 153, 158, 160.) In November 2004, Dr. Cooperstein again advised that he undergo this testing. (R. at 153.) Smith

finally underwent this nuclear stress test on December 7, 2004, more than two years following the time that it was first recommended. (R. at 269.) This testing showed no evidence of myocardial ischemia, no evidence of prior myocardial infarction and normal-sized left ventricular cavity with normal systolic function of the left ventricle ejection fraction of approximately 60 percent. (R. at 269.)

It is apparent from these treatment notes that Smith habitually failed to follow medical advice. The ALJ stated in his decision that Smith's diabetes and hypertension could be controlled with medication, but that Smith was not compliant with treatment. (R. at 26.) The ALJ stated at a different point in his decision that, while Smith suffered from diabetes and hypertension, the record was "replete with references to [Smith's] noncompliance with treatment." (R. at 28.) A claimant's noncompliance with treatment may provide a basis for denial of disability. *See Blumberg v. Comm'r of Soc. Sec.*, 2005 WL 2453104, at *4 (W.D. Va. Oct. 4, 2005). The Social Security regulations require claimants to follow treatment prescribed by a physician if this treatment can restore the claimant's ability to work absent a good reason for not following such prescribed treatment. *See* 20 C.F.R. §§ 404.1530(b), 416.930(b) (2010). However, "[b]efore a claimant can be denied benefits based on his noncompliance with prescribed medical treatment, he must be given a full opportunity to express the specific reasons for his decision not to follow the prescribed treatment. *Nunley*, 296 F. Supp. 2d at 704. Social Security Ruling 82-59 states that "[d]etailed questioning may be needed to identify and clarify the essential factors of refusal" and that the "record must reflect as clearly and accurately as possible claimant's . . . reason(s) for failing to follow the prescribed treatment." S.S.R. 82-59, WEST'S SOCIAL SECURITY REPORTING SERVICE, 1975-1982 (West 1983). Ruling 82-59 "describes questioning of claimants regarding 'whether they understand the nature of

the treatment and the probable course of the medical condition (prognosis) with and without the treatment prescribed' and provides that the 'individuals should be encouraged to express in their own words why the recommended treatment has not been followed.'" 296 F. Supp. 2d at 704 (quoting S.S.R. 82-59, WEST'S SOCIAL SECURITY REPORTING SERVICE, 1975-1982).

Furthermore, Ruling 82-59 requires that the claimant be "made aware that the information supplied will be used in deciding the disability claim and that, because of the requirements of the law, continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits." *Nunley*, 296 F. Supp. 2d at 704 (quoting S.S.R. 82-59, WEST'S SOCIAL SECURITY REPORTING SERVICE, 1975-1982). Ruling 82-59 further emphasizes that "before a determination is made, the individual . . . will be informed of" the effect his noncompliance may have on his eligibility for benefits. *Nunley*, 296 F. Supp. 2d at 704 (quoting S.S.R. 82-59, WEST'S SOCIAL SECURITY REPORTING SERVICE, 1975-1982). "The ruling requires that the claimant be 'afforded an opportunity to undergo the prescribed treatment or to show justifiable cause for failing to do so' noting that it 'is very important that the individual fully understand the effects of failure to follow prescribed treatment.'" *Nunley*, 296 F. Supp. 2d at 704-05 (quoting S.S.R. 82-59, WEST'S SOCIAL SECURITY REPORTING SERVICE, 1975-1982).

In this case, the ALJ never questioned Smith at the hearing regarding his reasons for failing to comply with the prescribed course of treatment, to include things such as regularly checking his blood sugar levels, eating properly, accepting diabetic teaching, keeping appointments with various specialists and following through with recommended testing. In fact, there was no mention of Smith's noncompliance

whatsoever during the hearing, despite the importance placed thereon in the ALJ's decision. This being said, it also is apparent that the ALJ did not give Smith the required notice of the effect that his noncompliance could have on his eligibility for Social Security benefits.

All of this being said, I find that the ALJ erred by failing to abide by the requirements of Ruling 82-59, as adopted by this court in *Nunley*. Thus, I recommend remanding the case to the ALJ for such questioning regarding the reasons for Smith's documented noncompliance with the prescribed treatment stated above. The court is aware that Smith passed away following the ALJ's hearing. However, his wife, Lena Smith, brought this action on his behalf, and such questioning on remand shall be directed to her.

Given this recommended disposition, I will not address any of Lena Smith's remaining arguments related to Smith's physical impairments and his physical residual functional capacity, nor will I summarize any additional medical evidence related thereto. However, because there are no such serious noncompliance issues related to Smith's mental health treatment, I now will address Lena Smith's arguments as they are related to Smith's mental impairments and resulting mental residual functional capacity.

Lena Smith argues that the ALJ erred by failing to find that Smith's impairments met or equaled the listed impairment for depressive disorders, found at § 12.04. To meet the requirements of § 12.04, a claimant must show medically documented persistence, either continuous or intermittent, of four enumerated

symptoms of a depressive syndrome,[8] which result in at least two of the following:

1.　Marked restriction of activities of daily living;

2.　Marked difficulties in maintaining social functioning;

3.　Marked difficulties in maintaining concentration, persistence, or pace; or

4.　Repeated episodes of decompensation, each of extended duration.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)(1), 12.04(B) (2010). A claimant also may meet the requirements of this section if he has a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C) (2010).

---

[8]These enumerated symptoms include the following: (1) anhedonia or pervasive loss of interest in almost all activities; (2) appetite disturbance with change in weight; (3) sleep disturbance; (4) psychomotor agitation or retardation; (5) decreased energy; (6) feelings of guilt or worthlessness; (7) difficulty concentrating or thinking; (8) thoughts of suicide; or (9) hallucinations, delusions or paranoid thinking. *See* 20 C.F.R. Pt. 404, Subpt. P, Appl 1, § 12.04(A)(1) (2010).

Assuming that Smith could show four of the enumerated symptoms of depressive syndrome, the substantial evidence of record shows that he did not suffer from marked restrictions in any relevant areas, nor did he suffer from repeated episodes of decompensation of extended duration. A "marked" limitation is one that is "more than moderate but less than extreme" and exists where "the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). Repeated episodes of decompensation, each of extended duration, means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4) (2010). E. Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on November 10, 2005, finding that Smith suffered from a nonsevere affective disorder. (R. at 296-309.) He opined that Smith had no difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation of extended duration. (R. at 306.) Tenison noted that there was insufficient evidence upon which to make a finding regarding Smith's ability to maintain social functioning. (R. at 306.) Tenison was unable to make a finding regarding Smith's ability to perform activities of daily living because Smith did not return the appropriate questionnaire. (R. at 306, 308.) Tenison's findings covered the period from July 1, 2000, the alleged onset date, through November 10, 2005, the date he completed the PRTF. (R. at 296.) The ALJ discounted Tenison's opinion because he did not have the benefit of the reports of psychologists B. Wayne Lanthorn, Ph.D., and Gary Bennett, Ph.D., at the time he rendered it.

In April 2007, psychologist Lanthorn opined that Smith was incapable of

performing a 40-hour workweek due to his psychological difficulties, finding in a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), that Smith was moderately restricted in his ability to understand, remember and carry out detailed instructions, to make judgments on simple work-related decisions and to respond appropriately to changes in a routine work setting, and markedly restricted in his ability to interact appropriately with the public, with supervisors and with co-workers and to respond appropriately to work pressures in a usual work setting. (R. at 334-35.)  It appears that such findings are based on a mental status evaluation of Smith, as well as Smith's subjective complaints.  (R. at 327-32.)  Lanthorn administered no objective psychological testing to Smith.  Moreover, neither Smith's subjective complaints nor Lanthorn's mental status evaluation of him provides a basis for the imposition of such harsh restrictions as set forth by Lanthorn in the accompanying mental assessment.  For instance, Lanthorn noted that Smith exhibited no signs of ongoing psychotic processes or any evidence of delusional thinking.  (R. at 329-30.)  He performed Serial 7's without difficulty, recalled five words presented to him after 15 minutes, was able to spell the word "world" backwards, answered correctly all six questions asked to assess his general fund of knowledge and answered correctly all four questions asked to evaluate his basic judgment skills.  (R. at 330.)  Lanthorn opined that Smith was functioning in the high average range of intelligence. (R. at 330.) Smith reported that he could not recall what he read at times, he reported being "quite depressed," often preferring to be alone, and he reported frequent crying spells when alone. (R. at 330.) He admitted to ongoing transient suicidal ideation with no plan or intent.   (R. at 330.)   He reported impaired short-term memory and "weakening" concentration. (R. at 330.) Smith further reported irritability, impatience, feeling anxious, tense and jittery and experiencing difficulty being around others. (R. at 330.)  Finally, Smith reported fitful sleep.  (R. at 330.)  Lanthorn failed to specify

what medical/clinical findings supported the harsh limitations imposed on the mental assessment. Because Lanthorn's mental assessment of Smith is inconsistent with the findings from his mental status evaluation of him, and because it is inconsistent with the other substantial evidence of record, as outlined below, I find that the ALJ's decision to accord little weight to the mental assessment completed by Lanthorn is supported by substantial evidence.

Treatment notes from other treating sources in the record do not support these limitations imposed by Lanthorn, nor do they support a finding that Smith suffered from marked restrictions in any relevant area or that he suffered from repeated episodes of decompensation of extended duration. I first note that Smith received inpatient psychiatric treatment for depression with suicidal ideation with a plan to overdose at St. Mary's Family Center, ("St. Mary's"), from April 17, 2000, through April 21, 2000, more than two months prior to Smith's alleged onset date. (R. at 576-600, 678-88.) Over the course of this hospitalization, Smith's Global Assessment of Functioning, ("GAF"), score[9] improved from 28[10] at admission to 60[11] to 65[12] at

---

[9]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[10]A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas. . . ." DSM-IV at 32.

[11]A GAF score of 51 to 60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning. . . ." DSM-IV at 32.

[12]A GAF score of 61 to 70 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

discharge. (R. at 578, 589, 687.) He was diagnosed at discharge with major depression, first episode, severe, without psychotic symptoms. (R. at 578, 589.) Smith's treatment records since that time do not reflect significant limitations resulting from his depression. For instance, on July 20, 2000, the Beck Depression Inventory, ("BDI"), indicated only minimal depression. (R. at 664-65.) On August 17, 2000, Smith reported increased depression due to family circumstances, but by September 2000, he reported that things were going well at home, and his mood and affect were brighter than usual. (R. at 697-98.) The same was noted on October 17, 2000. (R. at 697.) Over the course of his treatment at St. Mary's, Smith's depression improved and/or was deemed stable for the most part. Although Smith's GAF score was assessed at 40[13] on November 7, 2000, (R. at 694), Anne Jacobe, a licensed clinical social worker, noted that Smith had made significant progress. (R. at 574.) He reported feeling pretty well on November 28, 2000, but his dosage of Paxil was increased due to increased anxiety. (R. at 574.) By December 8, 2000, Smith rated his depression as only a one on a 10-point scale, and he denied anxiety. (R. at 568.) Over the remainder of his treatment at St. Mary's, Smith rated his depression as ranging from a zero to a six. (R. at 546, 548, 550, 556, 558, 560, 562, 564, 566, 658.) On February 26, 2001, Dr. Inez White, M.D., a psychiatrist, diagnosed major depression, in partial remission, and she assessed Smith's then-current GAF score at 61. (R. at 572.) She prescribed Wellbutrin. (R. at 562.) In April 2001, the BDI again indicated only minimal depression. (R. at 662-63.) On May 23, 2001, Dr. White deemed Smith's insight and judgment as fair. (R. at 558.) She again diagnosed major depression, in partial remission, and she assessed Smith's then-current GAF score at

---

[13]A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. . . ." DSM-IV at 32.

68.  (R. at 571.)  By October 31, 2001, Smith rated his depression as a zero.  (R. at 550.)  Although he rated his depression as a three to four on November 26, 2001, Dr. White opined that Smith was "maybe minimally depressed."  (R. at 548.)  She again diagnosed major depression, in partial remission, with a then-current GAF score of 68.  (R. at 548, 570.)  On May 31, 2002, Smith appeared to have decompensated, rating his depression as a six to seven and noting that Wellbutrin made him irritable and paranoid.  (R. at 546.)  Smith reported a moderate to severe reduction in attention/concentration, as well as one to two crying spells weekly and mild obsessions.  (R. at 546.)  Dr. White diagnosed major depression, recurrent, and she placed his then-current GAF score at 64.  (R. at 569.)  Dr. White discontinued Wellbutrin and initiated Effexor.  (R. at 546.)  She did not schedule Smith for follow-up until three months later.  (R. at 546.)

Treatment notes from Dr. Cooperstein, Smith's treating physician, likewise reveal that Smith's depression was improved and/or stable with medication. In November 2000, Dr. Cooperstein diagnosed stable depression. (R. at 185.) On January 31, 2001, Smith had no complaints, and Dr. Cooperstein again deemed his depression stable, noting that his last episode of severe depression was in April 2000 and that he had experienced no suicidal ideation since that time.  (R. at 182.)  On August 20, 2001, Smith noted that Wellbutrin was working "quite well." (R. at 174.) On January 8, 2002, Smith's only complaint was a slight increase in irritability.  (R. at 169.)  On June 3, 2002, Dr. Cooperstein described Smith's depression as being under fair control.  (R. at 168.)  Specifically, she diagnosed depression under inadequate, but improving, control.  (R. at 168.) On August 16, 2002, Smith reported intolerance to Effexor.  (R. at 167.)  Dr. Cooperstein restarted Paxil and noted that bipolar disorder needed to be ruled out.  (R. at 167.)  On February 26, 2003, Smith reported

improvement from his previous visit. (R. at 166.) He was taking Lexapro and Klonopin as needed. (R. at 166.) On June 25, 2003, Dr. Cooperstein stated that Smith's nerves were "fairly stable." (R. at 161.) On November 5, 2003, Smith's anxiety symptoms remained fairly stable, despite reporting a lot of stress in his family life. (R. at 160.) On January 26, 2005, Dr. Cooperstein noted that Smith's anxiety was stable, but not well-controlled. (R. at 152.) On June 3, 2005, Dr. Cooperstein opined that Smith's anxiety was under improved control. (R. at 148.) Over the course of her treatment of Smith, Dr. Cooperstein placed no restrictions on his work-related mental abilities. Further, Dr. Cooperstein's treatment notes do not contain evidence that Smith suffered from any marked limitations in any relevant area or that he suffered repeated episodes of decompensation of extended duration.

Smith saw Mark Wade, a licensed professional counselor, from March 22, 2005, to August 25, 2005. (R. at 202-13.) Wade's treatment notes do not support a finding that smith suffered from any marked limitations in any relevant area or that he suffered repeated episodes of decompensation of extended duration. On March 22, 2005, Smith reported being depressed most of his life. (R. at 212.) He stated that he stayed mildly to moderately depressed with some bouts of severe depression. (R. at 212.) He reported having attempted suicide on more than one occasion, but denied any then-current ideations. (R. at 212.) He reported frequent crying spells, lack of motivation and decreased self-esteem. (R. at 212.) Smith stated that inpatient hospitalization in 2000 was beneficial. (R. at 212.) Wade diagnosed major depression and dysthymic disorder, and Wade assessed Smith's then-current GAF score at 55, with the highest in the previous six months being 60 and the lowest being 50.[14] (R.

---

[14]A GAF score of 41 to 50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . ." DSM-IV at 32.

at 208.) Wade noted that Smith appeared to be experiencing increased depressive symptoms likely due to his physical health. (R. at 203.) On June 7, 2005, Smith reported being somewhat more depressed due to coping with Legionella pneumonia. (R. at 206.)  He reported worrying about an inability to work and ruminating about verbal abuse by his father. (R. at 206.) Smith was alert, fully oriented and cooperative with a mildly depressed mood. (R. at 206.)  He denied suicidal or homicidal ideations. (R. at 206.) On June 21, 2005, Smith reported doing well overall, despite some depressive symptoms.  (R. at 205.)  His health status remained his main stressor.  (R. at 205.)  Smith's mood was mildly depressed, and he denied suicidal or homicidal ideations.  (R. at 205.)  Wade noted that Smith's health continued to greatly impact his mental status.  (R. at 205.)  Smith did not keep his appointment with Wade on July 12, 2005.  (R. at 204.)  On August 25, 2005, Smith reported increased depression due to health concerns and family stressors. (R. at 203.) He admitted to threatening suicide the previous night, but stated that he did not mean it.  (R. at 203.)  His mood was moderately depressed, and he admitted to suicidal ideations, but stated that he would not harm himself. (R. at 203.) Wade noted that Smith appeared to be experiencing increased depressive symptoms likely due to his physical health.  (R. at 203.)  Smith did not keep his appointment with Wade on September 7, 2005.  (R. at 202.)

Finally, due to this apparent conflict between Lanthorn's opinions and the other treatment notes of record, the ALJ asked Gary Bennett, Ph.D., a licensed clinical psychologist, to review the mental health records.  On July 24, 2007, Bennett stated that Lanthorn's conclusions were inconsistent with the majority of the evidence from Smith's treating sources, which suggested a far less debilitating mental illness.  (R. at 337.)  Specifically, Bennett noted that the basis for Lanthorn's finding that Smith was unable to perform a 40-hour workweek due to psychological difficulties was unclear.

(R. at 337.)  He noted that, in the absence of treatment records showing that Smith had deteriorated to the level described by Lanthorn, he would defer to the records of the treating sources.  (R. at 337-38.)  Bennett concluded that Smith's mental impairment did not meet or equal any listing.  (R. at 338.)

It is for all of the reasons stated above, I find that substantial evidence supports the ALJ's finding that Smith's mental impairments did not meet or equal the listing for depressive disorders, found at § 12.04.  Also for the reasons stated above, I find that substantial evidence supports the ALJ's weighing of the mental health evidence and his mental residual functional capacity finding – namely, that Smith could perform simple, routine work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists to support the Commissioner's finding that Smith's mental impairments did not meet or equal the medical listing for depressive disorders, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04;

2.    Substantial evidence exists to support the ALJ's weighing of the mental health evidence;

3.    The ALJ erred by failing to follow the procedures set forth in *Nunley* for denying benefits based on noncompliance with prescribed treatment as it related to Smith's physical

-23-

impairments; and

4.     Substantial evidence does not exist to support the Commissioner's finding that Smith was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Lena Smith's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand the case to the Commissioner for further evaluation consistent with this Report and Recommendation.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     October 15, 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE